# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ERIC DALLAS,                                  Case No. 1:09-cv-10

      Plaintiff,                          Weber, J.

vs.                                           Black, M.J.

OFFICER MICHAEL FORREST,

      Defendant.

## REPORT AND RECOMMENDATION[1] THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 12) BE DENIED

Plaintiff initiated this action on January 6, 2009 by filing a complaint pursuant to 42 U.S.C. § 1983 for deprivation of his constitutional rights under to the First, Fourth, and Fourteenth Amendments to the United States Constitution. (Doc. 1). Plaintiff claims that Defendant Michael Forrest, acting under color of law, used his position as a police officer of the Village of Golf Manor to arrest Plaintiff without probable cause, and in retaliation for Plaintiff having filed a written complaint against the Defendant with the Golf Manor Police Department complaining about Defendant's conduct.

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 12), the parties' responsive memoranda (Docs. 17, 20, 23), as well as Defendant's proposed findings of fact and conclusions of law (Doc. 19).

---

[1]      Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

# FACTS

Plaintiff is a 21-year-old resident of Golf Manor, Ohio. (Dallas Dep. at 4).
Defendant Michael Forrest is a police officer with the Village of Golf Manor.

*Plaintiff's Encounters with Officer Forrest in February and March 2008*

In early February 2008.  Plaintiff was teaching his younger brother, who had a learner's permit, how to drive.  (*Id*. at 36-37, 43).  They were practicing circling the block, making turns, and stopping.  (*Id.* at 36-37).

Officer Michael Forrest, who was on patrol that day, pulled them over for an alleged traffic violation (*i.e.* failing to stop at a stop sign).  (*Id.* at 37).  Plaintiff, however, testified that the car being driven by his brother stopped for three seconds at the stop sign before proceeding with a left hand turn.  (*Id.* at 36-37).  Plaintiff had a shotgun inside a case in the back of his Ford Explorer. (Plaintiff's Dep. at 38-40).  The driver's side window was down, and from outside the vehicle, Officer Forrest observed a rifle case.  (Dallas Dep. at  44; Forrest dep. p 15).  He asked Plaintiff and his brother if there was a rifle in the case. (Forrest Dep. at 15).  Plaintiff told Forrest there was a shotgun in the case. (*Id.*) .

Officer Forrest removed both Plaintiff and his brother from the car, placed them in handcuffs, and placed them in the back seat of his cruiser.  (Dallas Dep. at  37- 38, 44-45).  He then walked around to the rear passenger side door of the Explorer and removed the shotgun from the vehicle.  (*Id*. at 45-46).  He checked to see if the shotgun was loaded, placed the shotgun back in the case, and placed it back in the vehicle.  He

then removed Plaintiff and his brother from the cruiser, removed the handcuffs, and explained to them why they had been stopped.

The next encounter with Plaintiff and Officer Forrest occurred on March 14, 2008. Plaintiff was loading items into his Ford Explorer, which was parked in the driveway of his parent's house. (Dallas Dep. at 54-56). Plaintiff's sister's car was parked in the street directly in front of the driveway. (*Id*. at 56). Plaintiff's shotgun was on the floor of his Ford Explorer near the bench seat. (*Id*. at 54-55).

Plaintiff saw a medium sized dog (50 or 60 pounds) running down the street. (*Id*. at 57). Plaintiff testified the dog ran into his parent's yard and began growling and foaming at the mouth. (*Id*. at 58). Plaintiff told his sister not to run. (*Id*. at 59). Plaintiff got the shotgun out of his vehicle and loaded the shotgun. (*Id*. at 59-60, 61, 70, 94-96). The owner of the dog, Corey Stanford, then saw the shotgun Plaintiff was holding and said "Don't shoot the dog." (*Id*. at 70). Plaintiff called out to Corey to get the dog. (*Id*. at 59-60, 61, 71). The dog took off down the street, and Plaintiff placed the gun back in his vehicle, but did not unload it. (*Id*. at 60, 71-73).

Officer Forrest and Officer Cordes, in separate cruisers, received a dispatch for an individual who had pulled out a shotgun and pointed it at either the caller's dog or the caller's son at 6210 Graceland Avenue. (Forrest Dep. at 18). Dispatch incorrectly identified the individual as "Anthony Dallas" and stated he was in a green Ford Explorer. (*Id*. at 19).

Forrest and Cordes approached 6210 Graceland Avenue in their separate cruisers.

(Forrest Dep. at 19).  As Forrest approached, he observed a green Ford Explorer exiting a driveway a few doors down. (*Id.* at 20).  The officers conducted a felony stop on that vehicle with guns drawn on the occupants.  However, the occupants of the vehicle were a mother and her young daughter, not the Plaintiff.  (*Id*. at 36, 37).

Meanwhile, Plaintiff was down the street waving at Officer Forrest "to get his attention."  (Forrest Dep. at 39).  Forrest goes to Dallas and says, "Get your ass or jackass…down here." (Dallas Dep. at 77; Forrest Dep. at 46).  Officer Forrest also acknowledges using the word "Fuck" to establish some "emphasis."  (Forrest Dep. at 46).

Forrest also had Plaintiff sit in his cruiser.  Officer Forrest then had a discussion with Dallas about what occurred, and Dallas talked to the other witnesses at the scene. Forrest ascertained from the witnesses that after the dog had arrived, Plaintiff's sister had secured herself in one of the vehicles; and, meanwhile, Plaintiff went to his vehicle, removed the shotgun from its case, loaded it, moved back toward the dog, and allegedly said "come get your dog before I shoot it."  (Forrest Dep. at 22, 51-52).  Corey Sanford called for his dog and ran off, at which point, his mother called 911.  (*Id.* at 22).

Forrest explained to Plaintiff that if he had enough time to get out his shotgun, load it, and come back out onto the street, he should not have re-engaged the dog. (Dallas Dep. at 22).  Plaintiff used profanity and turned away, trying to ignore Officer Forrest. (Forrest Dep. at 23).  Forrest also used profanity during his conversation with Plaintiff.  (*Id*.).

Forrest then received a call that the owner of the dog, Corey Stanford, was at the police station waiting to speak with him. (Forrest dep. at 23). After checking the shotgun to make sure it was safe and unloaded, Forrest released Plaintiff and proceeded to the police station to speak with the Stanford (*Id.* at 23, 52-53).

*Plaintiff's complaint*

Upset by Officer Forrest's behavior, Plaintiff contacted Lt. Eddie Taylor at the Golf Manor Police Station, by phone, and was informed that he could file a written complaint, if he chose, regarding the conduct of Officer Forrest. (Taylor Dep. at 3; Dallas Dep. at 100). Dallas then filed a complaint regarding Officer Forrest's alleged unprofessional behavior during the March 2008 incident. (Dallas Dep. at 100, 101; Taylor Dep. at 8). Lt. Taylor proposed a "mediation" with both Dallas and Forrest. The mediation was to take place on Tuesday March 18. (Taylor Dep. at 12). Taylor's hope was that "…we could solve that without going any further with it..." (Taylor dep. at 12).

On March 18, 2008, Plaintiff arrived at the station an hour before the mediation was scheduled to begin and spoke to Lt. Taylor. According to Plaintiff, "Forrest came in. He had I guess the reports in his hand….And he said, and I quote, 'I'm not going to let those two idiots put this in my file.' He said this directly to Eddie." (Dallas Dep. at 107). Forrest then refused to participate in the mediation. (Forrest Dep. at 68, Dallas Dep. at 109).

Forrest, however, asserts that he declined to participate in the mediation because it was not consistent with the department's policy or practice and could cause Plaintiff to expect unreasonably that the charges would disappear. (Forrest Dep. at 68).

*Officer Forrest Files Charges*

Officer Forrest did not work the next two days after the March 14 incident. On March 18, 2008, when he returned to work, he spoke to the prosecutor regarding the incident with Plaintiff and the dog. The prosecutor instructed Forrest to file charges of aggravated menacing and inducing panic against Plaintiff in relation to the incident. (Forrest Dep. at 24).

Officer Forrest signed and filed two criminal complaints and two affidavits in the Hamilton County Municipal Court charging Dallas with inducing panic and aggravated menacing. (Forrest Dep. Exs. 3-6).

One affidavit stated:

"Eric Dallas did remove a shotgun from his vehicle, load it with shells and threaten to shoot the dog which belonged to another individual. The individual gained control of his dog and fled the area, calling 911 when he got home. Upon arrival, police spoke with Eric Dallas. Eric Dallas admitted to brandishing the firearm and claimed he had a right to shoot the dog because it was foaming at the mouth and he had to protect himself. While responding to the call police stopped a vehicle which matched the description of the vehicle Eric Dallas removed the shotgun from. The vehicle was stopped in accordance with a felony stop, the passengers were ordered out of the vehicle while officers had their firearms unholstered. Officer's then determined they had stopped the wrong vehicle. This action caused an outcry from the operator of the vehicle stopped and caused serious public inconvenience and alarm. Officer Forrest prepared the affidavit, complaint and warrant for Inducing Panic."

The other affidavit stated:

"Eric Dallas did remove a shotgun from his vehicle, load it with shells and threaten to shoot the dog which belonged to another individual. The individual gained control of his dog and fled the area, calling 911 when he

got home. Upon arrival, police spoke with Eric Dallas. Eric Dallas admitted to brandishing the firearm and claimed he had a right to shoot the dog because it was foaming at the mouth and he had to protect himself. Officer Forrest conferred with the prosecutor's office and was informed that Aggravated Menacing would be the appropriate charge. Officer Forrest prepared the affidavit, complaint and warrant for Aggravated Menacing."

Dallas was arrested pursuant to the warrant, and detained at the Hamilton County Justice Center for 8 or 9 hours. The case was continued several times, and the charges ultimately were dismissed at the request of the prosecution on December 9, 2008. (Dallas Dep. at 18).

## STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505 (1986).

**DISCUSSION**

*A.      Plaintiff's Claims relating the February 2008 Incident*

Plaintiff claims that his arrest in early February was without probable cause and in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  (Doc. 1, ¶ 14).  Plaintiff asserts that Officer Forrest lacked reasonable suspicion that he and/or his brother committed a crime.  Plaintiff further asserts that his arrest by the Defendant in early February 2008 was made without probable cause in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments.

Defendant, however, asserts that he is entitled to summary judgment with respect to these claims because Plaintiff was not placed under "arrest" and even assuming he was arrested, Defendant had probable cause for the alleged arrests.  Defendant further asserts that he is entitled to qualified immunity.

*i.      Reasonable Suspicion*

Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime.  *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996); *Terry v. Ohio*, 392 U.S. 1, 27 (1968).  The same standard applies to vehicle stops.  *Palomino*, 100 F.3d at 449; *see also Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  The Sixth Circuit has explained that the "reasonable suspicion" standard requires that law enforcement officers possess specific facts tending to indicate criminal activity before initiating an investigative detention:

"Reasonable suspicion" is more than an ill-defined hunch; it must be based

upon a particularized and objective basis for suspecting the particular person of criminal activity. It requires specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an investigatory stop.

*Williams v. Leatherwood*, 258 Fed.Appx. 817, 821, 2007 WL 4553712, 3 (6th Cir. 2007)

(citing *Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 813 (6th

Cir.1999).(internal citations omitted)

Here, Officer Forrest asserts that the he observed a traffic violation and pulled over the car driven by Plaintiff's brother. (Forrest Dep. at 11). Plaintiff, however, maintains that his brother stopped for three seconds at the stop sign before proceeding with a left hand turn. (Dallas Dep. at 36-37). Plaintiff further asserts that stopped for three seconds "because we saw [Officer Forrest] and we didn't need any kind of problem." *Id.*

Plaintiff, therefore, maintains that Defendant Forrest lacked reasonable suspicion that Plaintiff and/or his brother committed a traffic violation. Thus, if there was no "reasonable suspicion" that Plaintiff or his brother had committed a crime, then there was no justification for the traffic stop. *Williams v. Leatherwood*, 2007 WL 4553712 (6th Cir. 2007). Plaintiff maintains that if there was no justification for the stop, the detention was illegal.

As noted above, Plaintiff asserts that he stopped for three seconds at that stop sign because he spotted Officer Forrest and did not want any problems. Officer Forrest maintains that he stopped Plaintiff for a traffic violation. (Doc. 11, Forrest Dep. at 11). However, at his deposition, Officer Forrest could not specifically identify the reason Plaintiff's brother was pulled over. Forrest testified as follows:

Q.      Okay.  All right.  Now, what I want to ask you is what you recall of that, in your own words, of that stop.

A.      I observed the vehicle.  <u>It must have made some traffic violation</u>.  I stop vehicles for traffic violations or equipment violations of the law.

(*Id.*) (*emphasis added*)

Furthermore, Defendant's proposed findings of fact do not including any facts relating to the justification for the traffic stop, stating in pertinent part:

6.      Plaintiff was teaching his younger brother, who had a learner's permit, how to drive.

7.      They were practicing circling the block, making turns, and stopping.

8.      Officer Michael Forrest, who was on patrol that day, pulled them over.

(Doc. 19, p. 2).

Accordingly, based on the totality of the circumstances, the undersigned finds that genuine issues of material fact exist surrounding Officer's Forrest's reasonable suspicion that Plaintiff and/or his brother had committed a traffic violation or crime.

ii.      *Whether Plaintiff was arrested*

Defendant also contends Plaintiff was not "arrested" during either the February or March incident.  He was merely detained while Officer Forrest ensured his safety—as well as the safety of Plaintiff and the general public—by securing the shotgun.  "Neither the use of handcuffs nor detention in a police cruiser transform an investigatory stop into an arrest so long as the circumstances make it reasonable for the

officer to take these precautions." *Williams v. Leatherwood*, 258 Fed.Appx. 817, 822, 2007 WL 4553712, *5 (6th Cir., Dec. 20, 2007) (citing, *Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 815 (6th Cir.1999); *United States v. Critton*, 43 F.3d 1089, 1092-94 (6th Cir.1995)

Plaintiff must have been seized to be vested with any right to constitutional safeguards. *United States v. Mendenhall*, 446 U.S. 544, 553  (1980)  The test for determining whether a seizure has occurred is "whether, under the totality of the circumstances, a reasonable person would have believed he or she was not free to walk away." *United States v. Mendenhall*, 446 U.S. at 554-55, 100 S.Ct. at 1877.  Examples of circumstances that might indicate a seizure include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*.

Furthermore, the law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653  (1979); *see also Whren v. United States*, 517 U.S. 806, 809-810  (1996).

With respect to the February encounter, Plaintiff was handcuffed and placed in a police cruiser for 20 minutes.  Plaintiff asserts that the continued detention ripened into an arrest, because he  "he. . .  was deprived of his freedom in [a] significant way…" *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1989).  In view of those

circumstances, the undersigned finds that is for the jury to decide whether reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

B.    *Plaintiff's claims relating to the March Incident*

Plaintiff second cause of action asserts that his arrest on March 23, 2008 caused by Defendant's criminal complaints was without probable cause in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.[2]

i.    *Probable Cause*

"By virtue of its incorporation into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty.*" Baker v. McCollon*, 443 U.S. 137, 142-43, (1979).  Thus arrest, even without a warrant, does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law.  *Michigan v. DeFillippo*, 443 U.S. 31, 36

---

[2]  Plaintiff's complaint appears to assert that his detention/arrest related to the March incident was made in violation of his Fourth Amendment rights under the Constitution.  However, Plaintiff does not address this argument in his memorandum *contra* to Defendant's motion for summary judgment. Nonetheless, assuming Plaintiff is asserting a constitutional violation relating to his detention on March 14, 2008, the undersigned finds on the undisputed material facts that Officer Forrest's actions were not improper.  Officer Forrest received information from dispatch that Plaintiff had displayed a firearm during an altercation, and such information was sufficient to create a reasonable concern for the safety of everyone involved.  *Williams*, 2007 WL 4553712, * 5.  Unlike the February 2008 incident, based on the circumstances surrounding the March 14 incident, Officer Forrest had reasonable suspicion and/or probable cause to briefly detain Plaintiff while he gathered information relating to the incident.

(1979).  The Supreme Court has defined "probable cause" as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Id.* at 37; *See also Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975) ("a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime").

Furthermore, the Sixth Circuit has held that "the existence of probable cause in a §1983 action presents a jury question, unless there is only one reasonable determination possible." *Wilson v. Morgan,* 477 F.3d. 326, 334 (6th Cir. 2007); *Gregory v. City of Louisville*, 444 F.3d 725, 743 (6th Cir. 2006) ("In a §1983 action, the existence of probable cause is a question of fact."; *see also United States v. Gaudin*, 515 U.S. 506, 521 (1995).

Here, Plaintiff asserts that the charges filed by Defendant lacked probable cause. As noted above, Plaintiff was charged with aggravated menacing and inducing panic, relating to the incident with his neighbor's dog.

ii.  *Aggravated Menacing*

Aggravated menacing is defined in Ohio Revised Code § 2903.21, which states in part that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . ."  (*Id.*)

As detailed above, Plaintiff asserts that he observed a 50 or 60 pound dog

running down the street towards his sister.  According to Plaintiff, the dog was growling and foaming at the mouth.  (Dallas Dep. at 54-58).  Fearing the dog would harm his sister, he got his shotgun out of the car, and upon seeing the owner of dog, yelled, "Call the dog.  Call the dog.  He's going to bite my sister.  (*Id*. at 59.)  The owner yelled "don't shoot the dog."  Plaintiff further testified that the dog then took off down the street and the owner ultimately caught the dog.  Plaintiff maintains that the barrel of the shotgun was pointed to the ground during the incident.  (*Id*. at 62).  Thus, Plaintiff asserts that he did not "knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person" as required by Ohio Rev. Code Ann. § 2903.21.

Plaintiff further agues that his actions were permissible pursuant to Ohio Rev. Code Ann. § 955.28, which provides, in part:

> A dog that is chasing or approaching in a menacing fashion or apparent attitude of attack, that attempts to bite or otherwise endanger….can be killed at the time of that chasing, approaching, attempt, killing or injury.  If, in attempting to kill such dog, a person wounds it, he is not liable to prosecution under the penal laws which punish cruelty to animals.

(*Id*.)

Additionally, Plaintiff argues that reasonable minds could conclude that there was no probable cause for the menacing charge, where the Defendant, after having talked to all of the witnesses, did not file charges against the Plaintiff, until after Plaintiff filed his complaint against the Defendant alleging that Defendant engaged in unprofessional conduct at the scene.  Thus, Plaintiff asserts that reasonable minds could

conclude that Defendant himself did not believe that a chargeable offense had occurred.

According to Officer Forrest, however, when Plaintiff saw the dog, Plaintiff said "Oh, I got this."  Plaintiff then went to his vehicle, loaded the shotgun, and said "You got three seconds before I shoot your dog."  (Forrest Dep. at 53-54).  Officer Forrest further asserts that although Plaintiff claims the dog was growling and foaming at the mouth,  there is no evidence the dog actually attempted to bite or otherwise endanger Plaintiff's sister.  Thus, based on the information gathered by Officer Forrest during his investigation of the incident, Officer Forrest maintains that he had probable cause as a matter of law to believe Plaintiff had committed aggravated menacing.

Officer Forrest further argues that Plaintiff's reliance on § 955.28 is misplaced, as that section of the Ohio Agriculture Code is a defense to a civil claim by a dog owner for the destruction of his property.  It gives a person the right to kill a dog that "is chasing or approaching in a menacing fashion or apparent attitude of attack, that attempts to bite or otherwise endanger . . . a person . . . ."  The statute does not state that a person has a right to threaten a dog with a firearm—especially in a highly populated public area where such a display could induce panic.

Here, however, it is disputed whether Plaintiff threatened to shoot the dog,.  As noted above, he testified that he told the owner to "get his dog", and that he retrieved the gun to protect himself and his sister from the dog.  Notably, Defendant proposed findings of fact do not assert that Plaintiff threatened to shoot the dog, and states:

> 22.    Plaintiff saw a medium sized dog running down the street.

23.     Plaintiff testified the dog ran into his parent's yard and began growling and foaming at the mouth.

24.     Plaintiff told his sister not to run.

25.     Plaintiff got the shotgun out of his vehicle, loaded the shotgun and ran, with the shotgun, up behind his sister's car.

26.     The owner of the dog, Corey Stanford, saw the shotgun Plaintiff was holding and said "Don't shoot the dog.

27.     Plaintiff called out to Corey to get the dog.

28.     The dog took off down the street, back towards where it had come from, and Plaintiff placed the gun back in his vehicle, but did not unload it.

(Doc. 19, p. 3).

Moreover, although Officer Forrest argues that there is no evidence that the dog attempted to bite or otherwise endanger Plaintiff's sister, the fact that a large dog is running toward an individual, growling and foaming at the mouth, appears to constitute a dangerous situation. *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir.2000) (in making the probable cause determination, officers must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence before determining if they have probable cause to make an arrest.)

Based upon the evidence of record, the undersigned finds that there is sufficient evidence in the record to establish the existence of a genuine issue of material fact as to whether probable cause existed to charge Plaintiff with aggravated menacing. *Wilson v. Morgan,* 477 F.3d. at 334 (the existence of probable cause in a §1983 action presents a

jury question, unless there is only one reasonable determination possible.”).

      2.    *Inducing Panic*

Inducing panic is defined in Ohio Revised Code § 2917.31, which states in part: “[n]o person shall . . . cause serious public inconvenience or alarm, by . . . [t]hreatening to commit any offense of violence [or] [c]ommitting any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm.”

According to the inducing panic affidavit of the Defendant, “[the lady’s] vehicle was stopped in accordance with a felony stop, the passengers were ordered out of the vehicle while the officers had their firearms unholstered. Officer’s [sic] then determined they had stopped the wrong vehicle. This action caused an outcry from the operator of the vehicle stopped and caused serious inconvenience and alarm.” (Forrest depo. exhibit 3).

Accordingly, Plaintiff maintains that the action that caused the alarm was the Defendant’s action of stopping the wrong car. No action of the Plaintiff lead Defendant to go to the wrong car. Defendant did not point to the lady’s car. On the contrary, the Plaintiff was gesturing for the officer to come to him down the street. Undoubtedly, Defendant was seeking Plaintiff in response to a dispatch for the Plaintiff; however, Officer Forrest’s pulling over the wrong vehicle on the way to investigate or arrest the Plaintiff is not a criminal act of the Plaintiff.

Moreover, as noted above, genuine issues of material fact exist as to whether

Plaintiff threatened to shoot the dog, or was only trying to protect himself and his sister. Thus, it remains disputed whether Plaintiff committed or threatened to commit a crime a crime in the first instance, a prerequisite to be charged with inducing panic pursuant to Ohio Rev. Code Ann.§ 2917.31

### B. First Amendment Claim

Plaintiff's third cause of action alleges that his arrest on March 23, 2008 was in violation of Plaintiff's rights under the First Amendment to the United States Constitution.

A First Amendment retaliation claim has three essential elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See, e.g., Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998); *Lewis v. ACB Bus. Servs.*, Inc., 135 F.3d 389, 406 (6th Cir.1998); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997).

Defendant asserts that Plaintiff cannot establish the third element of a *prima facie* case of retaliation, *i.e.*, a causal connection between the protected speech and the adverse action, based on the timing of the charges against Plaintiff. According to Defendant, there is no evidence that the filing of the charges against Plaintiff had any causal connection to Plaintiff's internal complaint against Officer Forrest.

Notably, where temporal proximity between the time of the protected speech and the timing of the adverse action is used as evidence, a showing of temporal proximity alone is "insufficient to establish a causal connection for a retaliation claim." *Williams v. Ohio Dept. of Commerce* , 2010 WL 1610601, 11 (S.D. Ohio 2010) (quoting *Tuttle v. Metropolitan Gov't. of Nashville*, 474 F.3d 307, 321 (6th Cir.2007). A showing of temporal proximity must be coupled with "other evidence of retaliatory conduct" in order to sufficiently establish the causal connection element. *Id.*

Moreover, a plaintiff may establish the requisite causal connection by showing "a pattern of antagonism coupled with timing to establish a causal link." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir.1997). Thus, a plaintiff may establish that causal link by offering evidence which "gleaned from the record as a whole" could lead a reasonable fact-finder to infer causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000).

Here, Defendant asserts that the delay in the filing of charges was result of his schedule and his ability to talk with the Prosecutor. According to Plaintiff's testimony, however, when he was at the police station on Tuesday, March 18 (five days after the event), waiting for the Defendant to join him and Lt. Taylor, "Forrest came in. He had I guess the reports in his hand. …And he said, and I quote, 'I'm not going to let those two idiots put this in my file.'…And he says, 'Obviously, this guy's a criminal'—this is his exact words." (Dallas Dep. at 107). Forrest then filed the charges the next day, March 19.

Accordingly, the undersigned concludes that the circumstances relating to the filing of charges immediately after Plaintiff had filed his complaint against Officer Forrest, coupled with Plaintiff's previous encounter with Officer Forrest in February 2008, are sufficient to create an inference that Officer Forrest would not filed the charges if Plaintiff had they not engaged in protected activity.[3]  Trial is required.

### C. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009).  The Supreme Court has created a two-tiered test to determine whether or not defendants are entitled to qualified immunity.  *Saucier v. Katz*, 533 U.S. 194 (2001).  The first question a court must answer is whether the facts alleged show the defendants' conduct violated any of plaintiff's constitutional rights.  If that question is answered affirmatively, the court must then ask whether the right alleged was clearly established when the violation was alleged to have occurred.  *Id.* at 201.

The order for answering those questions was recently relaxed by the Court, but the essential questions related to qualified immunity remain unchanged.  *Pearson*, 129 S.Ct. 808.  While the existence of qualified immunity is typically a question of law, the

---

[3]  As noted above, genuine issues of material fact exist as to whether or not Officer Forrest had probable cause for the charges filed.

task simply cannot be done so long as the facts are in dispute. *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989).

Accordingly, because essential facts are in dispute, the undersigned cannot determine whether Defendants are subject to qualified immunity.

## CONCLUSION

Accordingly, based the foregoing, the undersigned concludes that genuine issues of material fact predominate this action, thereby precluding summary judgment. It is therefore **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 12) should be **DENIED.**.

Date:  5/27/10, nunc pro tunc 5/13/10,                    s/ Timothy S. Black_____
reflecting work as the assigned                                 Timothy S. Black
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ERIC DALLAS,                                    Case No.  1:09-cv-10

      Plaintiff                              Weber, J.

vs.                                             Black, M.J.

OFFICER MICHAEL FORREST,

      Defendant.

## NOTICE

      Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **14 DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **14 DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).